Good morning. May it please the court, my name is Terrence Kane and I represent Sandra Jones, the appellate in this case. The honors, if the hypothetical reasonable layperson who worked at a county detention center encountered a pretrial detainee who presented with vigorous shaking, red eyes, profuse sweating, would that person conclude that that pretrial detainee has a serious medical need? That is precisely what Antonio Jones presented on August 8, and four minutes later she called Nurse Grant to report these conditions to Nurse Grant. She called Nurse Grant because the county had a policy that before a 911 call could be placed or before a person could be taken to an emergency room, the nurse of the facility, Nurse Grant, had to sign off on that. And so at 319, that was the first call from Ms. reporting the same symptoms. And at that point Nurse Grant did not allow or did not direct any additional medical treatment or any additional care outside of the facility itself, just directed Ms. Grant to put Mr. Jones under a medical watch, which was observe him and every 15 minutes take his vital signs. Do you think those shaking and sweating and red eyes, do you see it trip to the hospital? If a call has to be placed reporting those symptoms twice in four minutes, I think so, Your Honor. Because after the first call the symptoms didn't abate. In fact, they sort of worsened and then there was a second call placed four minutes later. I think two calls in four minutes indicate that something is seriously wrong. Moreover, Ms. Grant... But they took steps, didn't they? They monitored him, they took his glucose, they were checking him every five minutes or something like that? There was difficulty doing so. There was an attempt to take his vitals, but those attempts were frustrated by his shaking and the inability for the equipment to obtain a reading. Now Ms. Dixon took a deposition and in that deposition she was asked, had this same situation presented itself at your home rather than at your workplace, what would you have done? And in her deposition she said she would have sought emergency medical care for a person who presented these same symptoms had that person been at her home. Now when she was asked why didn't she do what she would have done when she was at her home, she indicated I have policies that I have to follow at my workplace and I follow those policies, which means placing calls to Nurse Grant and following Nurse Grant's directives. Now there were other persons who observed these symptoms too and they too concluded that these weren't just ordinary run-of-the-mill symptoms that one might encounter with a pre-trial detainee. And there would be... Mr. King, can I... Excuse me for a second. Ms. Henderson, would you start our clock please? Oh, I'm sorry. Thank you. I'm sorry, Your Honor. I thought I did. Go ahead. As I was saying, Your Honor, there were other persons beyond Ms. Dixon who observed Mr. Jones and they too concluded that his condition was abnormal. And abnormal is the word that Ms. Dixon used in describing the situation as she saw it at the time. There was Officer Thomas Sumanich and he too observed Mr. Jones and he too was asked what he thought should have occurred there and he thought emergency medical care should have been sought but could not have been under the policy of the detention center that Nurse Grant had to authorize the seeking of medical care outside the facility. What does the policy say about the obligation of someone like the officers you've talked about to actually request emergency? So what's the difference between the officer calling Nurse Grant to say here's the problem and the officer calling Nurse Grant saying we need to call 911? Well, having to call Nurse Grant imposed a delay. That is, they would strictly adhere to this policy. They rigidly adhere to this policy. That even if in their minds the officers as well as Ms. Dixon concluded we need to call 911 now. We don't need to waste time calling another person and asking for permission to call 911 or we need to call 911 now or ask her to take the person directly to an emergency room. It's that additional step that was imposed by the county policy and when you're talking about a person's life or what could appear to be a person's life, every second, every minute counts. So it was that adherence to that policy that resulted in a delay in treatment that might have saved Mr. Jones' life. Was there evidence that the officers felt they were restrained from asking the nurse to call 911? In other words, that they thought I'm just supposed to relay what I see. I'm not supposed to give an opinion on whether this is in fact an emergency? There's no policy that prohibits the officers or Ms. Dixon from giving the opinion that you referenced. No, they could have given an opinion, yes. But there's no dispute that they didn't, right? They did not give an opinion that he needed emergency care. Rather, they deferred completely to whatever Nurse Grant decided she would do under those circumstances. Now they did offer, in their depositions, they did indicate that their opinion was something needs to be done now other than just call Nurse Grant. We either need to call 911 or we need to take them to an emergency room. But they felt constrained by this rigid policy that no direct transport to an emergency room, no direct call to 911 until such time as Nurse Grant signs off on it or approves it. And she never did that. There was also the other persons, Officer Scott, Officer Brockman, and Officer Mason, in addition to Officer Simanich, I don't know if I'm pronouncing his surname right, plus Ms. Dixon. That's five people who all, in the course of the discovery, indicated that this was a situation that needed to be addressed now and did not need to be delayed by making phone calls and waiting on approvals. Now speaking to the approval, Nurse Grant, having received in under two hours, she received three phone calls about the same individual. She received the first call at 319, the second call at 323, and then a call at 5 o'clock, which at that point he was probably deceased or near-deceased anyway. Now one would think that if you get three calls in under two hours about one individual, you would do something other than just say put him on medical watch or, after the first call, not say anything at all. Mr. Cain, I wanted to ask you about the interaction between Officer Scott and Nurse Grant. What does the record show about whether Nurse Grant was requested to evaluate Jones in person prior to the call at 459? There was no request that she observe him in person prior to the final call that she got, which was around 5 o'clock. But she had received, now she did say that when they were able to take his blood pressure, it was at 91, and she said that was a red flag. But in none of the two calls before the final one, the 319 or 323, when it was relayed to her that there was difficulty obtaining his vitals because he was shaking and the equipment couldn't seem to address that, she didn't ask any follow-up questions. She didn't offer any other directions other than put him on medical watch. It seemed as if this was just a pro forma, put him on medical watch, and that was it. Notwithstanding the fact that this is a second call in four minutes about the same person. And then when she got the final call, she went to where he was, where he was vomiting blood and was non-responsive. She didn't even call 911 at that point. And in her deposition, she said that she never even considered calling Dr. Stewart, either before she made physical contact with Mr. Jones or even after. So even after he died, Nurse Grant didn't even confer with Dr. Stewart to let him know that a pretrial detainee had died in custody. And one would think that a nurse who has veto power over whether one could seek additional medical care would at least confer with the physician after the fact, if for no other reason, to evaluate. Mr. Kane, I thought when she arrived and noticed the symptoms you mentioned, that she administered CPR and called 911. Well, she didn't do those things. Other officers on the scene did. Okay. Did she direct them to? Pardon me? Did she direct them to or did she know that they did? Well, she was there while he was being administered. He was an extremist when she arrived. And so when she arrived, there was an attempt to revive him. How about the 911 call? She didn't make that. Was she aware of it? She was aware of a 911 call after the attempt to revive him did not succeed. Was it at her direction? I don't think it was at that point. I don't think it was at her direction. And at that point, given his status at that point where it was obvious that he was unconscious, vomiting blood, unresponsive, at that point, people's instincts just take over. And I don't think anyone in that situation, a reasonable person, would say, well, can I call 911 or can I administer CPR? Those two officers at that point just did what any reasonable person would have done in that situation. So did they critically adhere to the policy if they did that? Well, those two officers at that point, when you have a person, well, was that adherence to the policy? Well, probably not. If the policy is, you can't. The policy didn't say you can't administer cardiopulmonary resuscitation without nurse grant's permission. Calling for 911 would be the implication of the policy, right? It would be. But one would have to act with reason. And that is if you have a person vomiting blood and who's laid out unresponsive, at that point, do you pause, do you wait, or just do what you're obligated to do under the deliberate indifference standard, which is administer care at that point. Now, speaking of after the fact, it is significant in my view that nurse grant never spoke with Dr. Stewart about this matter and said she never even considered doing so either before Mr. Jones died or even after. And again, if one is a nurse in charge of a facility and has veto power over when and how medical care will be administered, emergency medical care will be administered outside of the facility itself, and a pretrial detainee dies like that, particularly given the fact that in under two hours you've got three telephone calls about this same individual. And at no point did, the record shows, did she do anything other than come to the scene after it was too late. And she said something about, well, he had a 91 blood pressure and that was a red flag. But in those three calls, at no point did she ask what his blood pressure was at any point. She didn't ask what was his condition when he came to the facility, how long had he been presenting with these symptoms. She just took a call that seemed to last a few seconds and that was it. So that seems to be an actual awareness that this person presents with a serious medical need that wasn't a usual medical need as evidenced by the multiple officers, including Ms. Dixon herself, which they described as this is an abnormal situation. Something needed to have been done at that point. And Officer Simanich and Ms. Dixon both were asked the same question. They gave the same answer. Put this person at your home presenting with the same symptoms, what would you have done? And both said they would have sought emergency medical care, either take the person to the emergency room or call 911. Is there anything in the record to show had Nurse Grant acted promptly? I think you're saying 315-ish, 320, that they could have gotten this man to the hospital in time to get him care? That second call, the first one's at 319, the second one's at 323, a mere four minutes later. After that call, had Nurse Grant done something other than say put him on medical watch, he could have been taken to the emergency room because he died around 5 o'clock. So it was three nights, it was 323 to 5 o'clock. And during that time period, his symptoms worsened. So the evidence that you rely on is just really the timing, that he was still conscious and aware at 324 and just within an hour and a half he was deceased? Yes, Your Honor. But no medical reports, no medical testimony about, given what his issue was, he could have been saved? No, there's no medical record that says but had he received care shortly after that second call, he would have lived. That's not in the record. Now I'll turn to, Your Honor, the municipal liability claim. This policy that we touched on briefly is the direct result of Dr. Stewart, who was the final decision maker with respect to the medical policy, issuing a directive that there will be no transport to an emergency room, there will be no 911 call unless Nurse Grant signs off on it first. And that is, that was the moving force behind Mr. Jones' demise. Because even in the moments when Nurse, Ms. Dixon made those calls and Officer Simanis tried to assist her with getting his vitals, they knew, as indicated in the deposition testimony, that we need to do something other than just make a call to Nurse Grant. But we can't do anything because of this policy that was prescribed by and enforced by Dr. Stewart as the final decision maker for the county with respect to what the protocols would be in the event a pretrial detainee presented symptoms of illness and in need of medical care. Your Honor, I'm approaching my rebuttal time. Unless the Court has any other questions, which I'll certainly be pleased to answer, I'll ask the Court's permission to stand aside at this time. Thank you, Mr. King. Mr. Owens, two mornings in a row. Good to see you again, Your Honor. May it please the Court, my name is Jason Owens. I represent the separate Faulkner County defendants here, which are Leigh Ann Dixon, Karen Grant, and Faulkner County itself. My co-defendant's counsel, Dustin Darsh, represents Dr. Stewart. I want to respond briefly here at the outset about something that was visited upon several times by counsel, and that is these phone calls, which he couches as should have sent off alarm bells that there were this many phone calls in this short period of time. The opposite is actually true. The first call was not one that Nurse Grant expected, but she received it and gave instructions to give the second call. She said, take the vital signs and call me right back. That's what happened. It wasn't two calls because something bad had happened in the intervening four minutes. It was to relay the vital signs. She was concerned about the blood glucose. She thought the sweating was related to diabetes. All this is undisputed. She asked for the blood glucose and other vital sign readings. She got the blood glucose back, which was a normal reading. They were unable to take a blood pressure at that time. Nurse Grant testified again without dispute. They've got kind of a finicky, because it's an automatic cuff, it's a little more finicky than normal, and sometimes you can't get readings if there's any kind of shaking going on. Let me ask you about that, counsel. If I understand correctly, Officer Scott testified that he asked Grant to come down here and help us make sure his blood pressure is taken correctly. Is that correct? If so, when did that happen? That was the 4.59 p.m. call. That was the call, the terminal call, essentially, that she responded to within two or three minutes and came to the very end. I thought the shaking and the blood pressure problems occurred a little earlier than that. Well, they did, and then apparently they occurred at the terminal event as well. After these first two calls, where the nurse says, call me back in a couple minutes with the new reading. She does. She says, okay, put him on a watch every 15 minutes, and call me back on the hour unless things get worse. Well, when's the next call? An hour later. They had done three other 15-minute checks on this man and not called the nurse. Instead, she got the second call, or the third call actually, when she expected to get it, an hour later. The answer was, well, we got the reading this time. We got a 103 over 85 blood pressure reading, completely normal. We got a 90 plus pulse ox reading, again, completely normal. It also hardened the nurse at that point to hear that they had gotten a blood pressure reading because it indicated to her that the shaking had dissipated in the last hour. She didn't get the next call until 459 from Officer Scott, and he says, hey, you need to come down. At that point, he didn't say, you need to call 911. Nobody ever asked the nurse to do that. She responded, had some mobility issues of her own at that time, and so it took her two or three minutes to get from the far wing down to the cell, and when she arrived, she immediately, and this is all undisputed, she immediately ordered the person at the desk sitting in front of the phone to call 911, ordered the officers to start CPR, and to administer Narcan, all three of which occurred. They continued CPR until the ambulance arrived. That's not a record of deliberate indifference, certainly not for qualified immunity purposes. The plaintiff in his briefing addresses, misapprehends qualified immunity. They cite 25-year-old cases to speak to the old and now discarded broad view of qualified immunity that doesn't require particularized facts in a case. Of course, that's been abandoned by the Supreme Court in the last decade. They've said that— Mr. Owens, what was the timing between observing the vomiting and bleeding and the arrival of the nurse? At 459, 5 o'clock, the Officer Scott calls and says he's throwing up. Nurse Grant understood him to be coherent standing up at that time, although that apparently was not the case. She instructs him, get him over a trash can, I'm headed your way. That's what happens. She says there's bleeding from the nose. She instructs them to put something up his nose to see if they can stem the bleeding, thinking it's a normal nosebleed. Obviously, when she arrives, it's a different situation than what had been relayed and had invariably gotten worse in a minute or two. What are we talking about, three to four minutes between when she gets notice of that and her arrival? That's the timing on the paper. Scott says he calls at 459. She says she arrives at 503. Is it different than some other world? No, no. It's just, I think it's impossible to know down to the second. But it's an area of two or three minutes. Certainly less than a normal response time for an ambulance in the picnic situation. That's brought up, let me speak first of all to a quotation that was attributed in the plaintiff's brief I want to clue the court in on, on page 459 of the appendix. The appellant says that Officer Scott told Nurse Grant that he might have taken something. Well, the actual quote is, before that she says, they had told me about somebody else that he might have taken something. So that quotation is not apt to this case. It's inappropriate completely. Because Mr. Jones here denied taking anything, right? He did, multiple times. He did in Dixon's presence once or twice, and then the other officers testified. The other officers were not sued here, of course. We're talking about the CNA, Ms. Dixon, the nurse, Ms. Grant, and the county itself. Wasn't there one of the other officers, was it Brockman, who said, it was pretty clear to me that it was a drug problem, a drug-induced reaction? Yes, I think a couple of them said, of course, you know, it's the problem with hindsight, is that whenever the bad thing happens, someone always says, oh, I knew it was going to happen. But she testified that, at that time, that's what I believed it was, right? So, I mean, that's the record. I think that's right. But the problem with using hindsight, of course, is that, well, why didn't you tell somebody the bad thing was going to happen? And that's the problem here, and the reason for qualified immunity adopting this particularized view, that it has to be a case right on point. If you look at the cases that are cited by the appellant, they're not even close to the fact pattern in this case. They cite cases where medications were missed for months by a doctor and his staff. Just nothing even close to this fact pattern. There simply aren't any particularized cases that would have put these officers on notice that what they were doing transgressed some bright line in the law, as the Supreme Court has required in Pauley v. White and Pearson v. Callahan, which are also cited by the appellant. With respect to the claim against the county, the policy that they claim, even if it was in existence and enforced in any way, which was in dispute, it wasn't implicated here, because no one asked to send this man to the hospital. They didn't see the need for that. Even Dixon said he didn't appear in need of emergency medical treatment when I saw him. She was talking to him. He was coherent. He was answering questions appropriately. She asked him point blank at least once, and I believe it was twice, did you take anything? He said no. It's an interesting question, the facts of this case, because normally with intoxication, the person is intoxicated when they come into the jail. This is intoxication hours after his initial incarceration. Was there anything in the record about how this policy normally plays out? In other words, that yes, in the past, I, officer so-and-so, have called the nurse and said, please call 911 because of this reason, or no, I never feel like I can say that. I just describe the symptoms, and then I understand the policy to be that I just have to leave it up to her. No, to the contrary. There was evidence in the record. I believe there was testimony in the record that jailers called ambulances when they needed to. That wasn't really even a policy at that point. So it's in the record that prior to this date that the officers didn't feel bound by that policy? Because it seems like there is that sense that they felt constrained by a policy, and it's a little unclear what that constraint was, what they actually felt they were constrained from doing. Well, certainly I think they were advised, as is any layperson in a custodial setting like this, with medical staff on site to consult with medical staff when you run into an issue. That certainly was the policy or custom or whatever word you want to use. Oh, I thought it was they could not call 911 without the approval. No, no, I'm talking about calling the nurse on staff. I think they were certainly encouraged to do that and did that here. Clearly had no problem doing that. There was certainly no restriction or limitation on that in any way. In fact, the nurse was telling them to call her to give more information if things worsened. They didn't. They called and gave their one-hour report to say that really from her vantage point, from the nurse's vantage point, things had gotten better. They were able to get a blood pressure reading. They were able to get a pulse ox reading, which measures, of course, the oxygen in the blood. Both of those were completely normal at that time. The key here, and counsel used this phrase, it's the phrase that the U.S. Supreme Court has used with respect to municipal liability for decades now, that it must be shown that the policy or custom was, quote, the moving force, not a proximate cause, but the moving force behind an underlying violation. Of course, we don't believe they've proved an underlying constitutional violation or can because there was no deliberate indifference here. But even if they could, because this policy wasn't implicated by the facts, there's no way that they could show that the policy was the moving force behind the violation. I see I'm running out of time here. I won't allow my co-counsel the opportunity to speak to claims regarding Dr. Stewart. No more questions. Thank you. Thank you, Mr. Owens. May it please the court, my name is Dustin Darst. I represent Dr. Gary Stewart for the limited purpose of his state law medical malpractice claim. And that claim is not on appeal here. The issue related to this claim for Dr. Stewart is whether or not that should have been dismissed with prejudice or without prejudice. The briefing, I laid out the case law. That issue is purely discretionary with the trial court. And that discretion is substantial. I cited in the case law that that issue is also waivable. In this case, the plaintiff filed her complaint in federal court. This is not a removal case. The court entered a scheduling order. The parties followed the scheduling order. We completed discovery. We filed substantive motions. The plaintiff filed a response to my motion on the merits and did not ask that the court not exercise its pending jurisdiction on that claim if it dismissed or granted some judgment on the federal claims. The plaintiff then filed a motion to amend the judgment. And again, the plaintiff did not ask the court to consider its pending jurisdiction. The first time that issue was waived was here in this appeal. Several other circuits have ruled on that directly that if that issue is not at least requested at the district court, it's waived here. And because it's purely discretionary, it's not something that should be addressed at this juncture. The 8th Circuit has cited those cases. And the 8th Circuit has also noted that the failure to raise that issue with the district courts is a clear sign that there's no abuse of discretion in the courts taking up and ruling on that issue. I also cited some 8th Circuit cases that talk about once discovery is complete and the case is ready for trial, if the court takes up summary judgment on a state law issue, that's perfectly within its discretion. That's the right time for it. We all spent a substantial amount of time getting discovery ready in this case. The plaintiff had ample time to raise that issue. We should not have to go back and do all of this again. The plaintiff brought this case to federal courts. It was properly before the district court judge. He considered the issue. It's well within his discretion. And I think the briefing explains it, and I'm here to answer any questions if you have any. Hearing none, thank you, Mr. Darstner. Mr. Kane, your rebuttal. Your Honor, with respect to qualified immunity, the district court did not address at all whether the contours of the right were clearly established because the district court started with, was there a violation of a federal right in the first place? And the district court erroneously, in my view, concluded that there wasn't. Therefore, the district court didn't engage in any analysis regarding was there a case on materially similar facts that placed the contours of the right beyond debate. So the argument that Mr. Jones failed to cite a case on point does no work here because we're dealing with the question that the district court took up was, was there a violation of the federal right in the first place? It could do some work because we could affirm on either basis, could we not? Well, this court has said that it won't reach an issue that the district court itself didn't reach. It would be quite an aggressive act by this court to reach out and address the clearly established prong, which the district court itself elected not to do under Pearson. For this court to do that would be a very aggressive move and instead of analyzing was the district court correct in finding that there was no violation of a federal right in the first place. In terms of this court's taking a broad view, the Supreme Court has not said that only a particular universe of cases matter or are the universe of relevant cases with respect to clearly established. But again, this court should leave that issue aside because the district court didn't address it and there's no need for this court to address something that the district court didn't address either. Now, there was several mentions and even by the district court, well, Mr. Jones did not, well, Mr. Jones lied about ingesting drugs. Well, okay, so what if he did? In addressing a pretrial detainee's medical need, the persons who have an obligation to meet that need don't defer to the pretrial detainee's own diagnosis of what's wrong with them. I mean, that would be perverse. So, no, he wasn't truthful that he had ingested drugs, but given the symptoms that he exhibited, exhibiting those symptoms is what should have controlled rather than relying on what he said he took or that he didn't take. And finally, with respect to the state court claims, district courts routinely, when you have these mixed claims, state and federal claims, if they dismiss the federal claims, they stay their hand and decline to exercise jurisdiction over the state claims. We oppose the motion for summary judgment on both the state claims and the federal claims, so there was no need to make this separate argument, oh, by the way, if you dismiss the federal claims, decline to exercise jurisdiction over the state claims. Your Honor, I'm out of time. I want to thank the courts for its time and its patience. The court likes to thank all counsel for your appearance and argument today. The case is submitted and we'll issue an opinion in due course.